# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

records and information associated with the cellular telephone assigned call number 414-722-2574 (Target Phone), that are stored at premises controlled by Sprint ("the Provider"), headquartered at 6480 Sprint Parkway, Overland Park, KS 66251

)
)
)
)
)
)
)

Case No. **19-MJ-1343**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:
    ☒ evidence of a crime;
    ☐ contraband, fruits of crime, or other items illegally possessed;
    ☐ property designed for use, intended for use, or used in committing a crime;
    ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 18, United States Code, Section 844(i)

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Luke Barker, Special Agent
*Printed Name and Title*

Sworn to before me and signed in my presence:
Date: **10/28/19**

*Judge's signature*

City and State: Milwaukee, Wisconsin      William E. Duffin, U.S. Magistrate Judge
*Printed Name and Title*

# AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Luke Barker, being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF), and have been since November of 2015. From November 2015 until June 2016, I attended the Federal Law Enforcement Training Center and the ATF National Academy in Glynco, Georgia. I have been trained to investigate violations of federal firearms laws and Arson and Explosives laws found in Title 18 of the United States Code. Prior to my employment as an ATF Special Agent, I was employed as a Police Officer with the Aurora Police Department in Aurora Colorado from January 2008 to November 2015. I have close to 12 years of total years in law enforcement.

## II. PURPOSE OF AFFIDAVIT

2. I make this affidavit in support of an application under Title 18, United States Code, Section 2703(c)(1)(A) for information about the location of cellular telephone assigned call number 414-722-2574 (**Target Phone**), whose service provider is Sprint, a wireless telephone service provider headquartered in Overland Park, KS. The **Target Phone** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

3. Based on my training and experience and the facts as set forth in this affidavit, I submit there is probable cause to believe that Marvin Davis has committed violations of Title 18, United States Code, Section 844(i). There is probable cause to believe that, at the time he committed these violations, Davis was in possession of the **Target Phone**, which belongs to the victim (A.W.) of a strong-arm robbery committed by Davis. There is also probable cause to

believe that the location information described in Attachment B will constitute evidence of criminal violations of 18 U.S.C. § 844(i).

## III. PROBABLE CAUSE

4. On September 25, 2019, at approximately 3:55 a.m., Milwaukee Police Department (MPD) and Milwaukee Fire Department (MFD) were dispatched to a fire of a rental property located at 2771 & 2773 N. 39th St.

5. The rental property included a lower (first floor) unit, an upper (second floor) unit and a common basement shared by all the tenants. There are two doors in the front of the property. One door leads into the lower unit and the second door opens to a stairwell that leads to the upper unit. The rear of the residence has one door. The rear door opens into a common space that has a door to the lower unit, a stairwell to the basement and a stairwell that leads to the upper unit.

6. MFD arrived on scene at 4:01 a.m. MFD located and extinguished a fire in the basement of the property.

7. MPD arrived at approximately 4:00 a.m. and secured the scene. One of the MPD officers responded using the alley that leads to the rear of the residence. The Officer entered the alley from the south and drove northbound through the alley towards the residence. As the Officer was driving northbound, he observed a black male in the alley on a bicycle riding northbound. The MPD officer described the male as wearing all dark clothing and stated the male looked back toward his squad car briefly and then continued riding his bicycle northbound through the alley. After the fire was extinguished, MPD officers conducted preliminary interviews with the residents.

8. On September 25, 2019, at approximately 9:15 a.m., ATF Special Agents interviewed the residents of the upper unit, JM and RM. The following are the details of the fire given by JM and RM.

9. JM, RM, and their baby were all asleep in their room when, at 3:09 a.m., JM was woken up by the sound of a door being closed. JM said it sounded like the door from the kitchen to the rear stairs. These stairs lead to the lower level and rear door of the property.

10. A few minutes later JM and RM observed the shadow of someone walk by their bedroom door (Their bedroom door was slightly ajar).

11. RM left the bedroom to see who was in their apartment. RM found Marvin DAVIS (B/M DOB: 4/1/1993) in their living room. DAVIS was wearing all dark clothing and black and yellow shoes.

12. DAVIS used to be a roommate of JM and RM, but was evicted a few months ago because he stopped paying rent. JM stated that DAVIS has broken into their apartment numerous times.

13. RM confronted DAVIS in the living room and could tell he was intoxicated. RM told DAVIS he had to leave, but DAVIS refused. RM threatened DAVIS with physical force if he did not leave the apartment. RM then left and returned to his bedroom.

14. JM and RM spoke in their room for a number of minutes and talked about what to do with DAVIS. A few minutes later, they left their bedroom to confront DAVIS, but he was no longer in their apartment.

15. JM and RM took their time looking for DAVIS in their apartment because they believed he was hiding somewhere. They did not find DAVIS. A few minutes later JM could smell smoke.

3
Case 2:19-mj-01343-WED   Filed 11/12/19   Page 4 of 12   Document 1

16. RM went downstairs to the rear lower part of the rental property but could not see any smoke. RM then returned to his apartment upstairs. JM stated a few minutes later the smoke smell became stronger and it smelled like "burning clothes." JM could also hear what sounded like a smoke alarm coming from downstairs.

17. JM and RM began walking down the front stairs in the front of the apartment. These stairs lead down to the front entrance of the rental property. As they began walking down the stairs (on the northeast side of the property), JM could see the reflection of flames in the next door neighbor's window.

18. RM used the stairs in the rear of the apartment to go back downstairs and check on the fire. RM observed a large amount of smoke coming from the basement and yelled up to JM to leave the apartment through the front stairs. RM then exited the building from the first floor rear door, which was unlocked.

19. JM and her infant baby left the apartment through the front door. JM said she had to unlock the front door to exit the property.

20. JM stated that approximately twenty (20) to thirty (30) minutes had passed from when she initially woke up at 3:09 a.m. to when she first began smelling smoke.

21. Before JM and RM went to bed that night, they confirmed that both the front door to the apartment and the rear door to the rental property were locked. JM and RM stated when they evacuated the property the front door was still locked, but the rear door was unlocked.

22. JM stated she believes DAVIS broke into the apartment by climbing onto the second story balcony and using the window close to the balcony to gain access to the apartment. JM said the window in their living room, just to the right of their balcony, was not open that night, but the window cannot be locked.

23. JM and RM both confirmed that DAVIS is a smoker.

4

24. Special Agents have information that DAVIS was the suspect in an armed robbery that occurred at 1:50 a.m., approximately two hours before the fire, at 2841 W. Highland Blvd in Milwaukee. This address is south of the fire scene, approximately 2.4 miles away.

25. On October 3, 2019, ATF Special Agents interviewed the victim of the robbery, AW, who gave the following details. AW and DAVIS are friends who met each other in February of 2019.

26. On the night of September 24, 2019, Marvin DAVIS visited AW at her apartment and the two got into a verbal argument.

27. The verbal argument escalated and DAVIS forcefully grabbed AW's cell phone from her. A physical altercation ensued and DAVIS bit AW on the arm and used pepper spray against her. DAVIS then left AW's apartment with her cell phone and her "bic" lighter.

28. AW described DAVIS as a black male wearing all black clothing with back and yellow shoes.

29. AW confirmed her cell phone has GPS locations services for a number of apps. AW confirmed the phone number for the cell phone DAVIS took from her is (414) 722-2574.

30. In my training and experience, I have learned that Sprint is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower

5
Case 2:19-mj-01343-WED   Filed 11/12/19   Page 6 of 12   Document 1

closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

31. Based on my training and experience, I know that Sprint can collect cell-site data about the **Target Phone**. I also know that wireless providers such as Sprint typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes. On September 25, 2019, a request was submitted to Sprint to preserve the data associated with the **Target Phone**. On September 30, 2019, I received a confirmation of preservation letter from Sprint with assigned Sprint case # 2019-193236.

32. Based on my training and experience, I know that wireless providers such as Sprint typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as Sprint typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **Target Phone** user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

33. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

34. I further request that the Court direct Sprint to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on Sprint, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## ATTACHMENT A

### Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call number 414-722-2574 (**Target Phone**), that are stored at premises controlled by Sprint ("the Provider"), headquartered at 6480 Sprint Parkway, Overland Park, KS 66251.

## ATTACHMENT B

### Particular Things to be Seized

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period between 12:30 a.m. and 5:00 a.m. CST on September 25, 2019:

a. The following information about the customers or subscribers of the Account:

   i. Names (including subscriber names, user names, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 844(i) involving Marvin Davis during the period between 12:30 a.m. and 5:00 a.m. on September 25, 2019.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

2

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Sprint, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Sprint. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

    a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Sprint, and they were made by Sprint as a regular practice; and

    b.    such records were generated by Sprint electronic process or system that produces an accurate result, to wit:

        1.    the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Sprint in a manner to ensure that they are true duplicates of the original records; and

        2.    the process or system is regularly verified by Sprint, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____    _____
Date                                        Signature